IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel. TONY THOMAS, ) ) ) | |
| Petitioner, ) ) | |
| ) | 07 CV 6443 |
| v. ) ) | |
| ) | Honorable Charles R. Norgle |
| RANDY PFISTER,[1] ) ) | |
| Respondent. ) | |

**OPINION AND ORDER**

Before the Court is Petitioner Tony Thomas's ("Thomas") Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. For the following reasons, Thomas's petition is denied.

**I. BACKGROUND**

**A. Facts**

A state court's factual findings are "presumed to be correct" on federal habeas corpus review unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The Court takes the following facts from the relevant Illinois state court opinions. Following a jury trial in the Illinois state court, Thomas was convicted of first degree murder for the fatal shooting of Khatim Shakir (the "victim"). The trial court sentenced Thomas to 50 years' imprisonment for the murder, and an additional mandatory term of 25 years' imprisonment pursuant to 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(d)(iii), for a total

---

[1] Although formerly in the custody of Mike Atchison ("Atchison"), Warden of the Menard Correctional Center, Petitioner is currently in the custody of Randy Pfister ("Pfister"), Warden of the Pontiac Correctional Center. Thus, Pfister is substituted for Atchison as the named defendant pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts and Federal Rule of Civil Procedure 25(d).

sentence of 75 years' imprisonment. Thomas's conviction and sentence were affirmed on direct appeal.

The evidence produced at trial established that on the evening of September 22, 2001, the victim was at a party in Chicago, Illinois with his girlfriend, Vanessa Perez ("Perez"), Fernando Cota ("Cota"), Henry Igunbor ("Henry"), and Joe Igunbor ("Joe"). The group left the party to go to a liquor store at the corner of Belmont and Sheffield where they met up with Gregory Hoyos ("Hoyos"), who is a member of the Latin Kings street gang. While Hoyos was outside of the liquor store, a man, who was later identified as Thomas, approached Hoyos and stated "what's up, motherfucker, G.D.," which indicated that Thomas was a member of the Ganger Disciples, a rival street gang. Hoyos testified that he "shook him off" and ignored Thomas. Shortly thereafter, Cota and the victim, who had been a member of the Latin Kings, walked towards Hoyos. The victim and Hoyos "shook up the crown" or shook hands using the Latin King's handshake. Thomas then approached Hoyos and the two exchanged heated words, during which Thomas identified himself as a "King killer," which meant that he killed members of the Latin Kings. Thomas then pulled a gun from his waistband and pointed it at Hoyos. Thomas fired the gun four to five times while Hoyos and the victim ran across the street. The victim, who was behind Hoyos, yelled that he had been hit. When the group returned, they found the victim collapsed in the street in a pool of blood. The shooting was reported to Detective Tony Villardita of the Chicago Police Department at 2:25 a.m. on September 23, 2001. Within days of the shooting, Perez, Cota, Henry, Joe, and Hoyos positively identified Thomas as the shooter in both a photo array and a live line-up. Later, the five witnesses made in-court identifications of Thomas at his trial.

In addition, Officer John Massi ("Massi") of the Chicago Police Department testified that earlier that evening between 11:30 p.m. and 12:00 a.m., he came upon a group, including Thomas, in a heated conversation at the corner of Belmont and Sheffield. Massi told the group to disperse, although some remained. At one point, Massi spoke with one of the individuals, who was later identified as Thomas, who told Massi that he "wasn't about to take any shit off of anyone" and that "if any of the local gangbangers fuck with me, I'm going to come back with my shit and blow them away." Massi once again asked the group to leave the area. Thomas then got into a taxi cab with four other people and left the area. A few days later Massi identified Thomas from a photo array as the man who he had spoken to that evening.

At trial, Thomas presented an alibi defense, arguing that he was on the south side of Chicago when the shooting occurred on the north side at Belmont and Sheffield. Thomas testified that he lived on South Troy Street with his mother, Frances Thomas, on the south side of Chicago; however, police officers testified that Thomas initially told them that he lived on the 700 block of West Waveland on the north side. In any event, Thomas stated that, on September 22, 2001, he met with his girlfriend, Delilah Cruz ("Cruz") at his mother's house and they left together at approximately 4:00 p.m. to take the train to Gill Park, which is located at Irving Park and Broadway on the north side. Thomas said that he and Cruz left the park around 10:30 p.m. or 11:00 p.m. to go to the liquor store on the corner Belmont and Sheffield. Once there, Thomas got into an argument with local members of the "Belmont and Sheffield" Gangster Disciples, which was a different branch of the gang that he associated with in Gill Park. Officer Massi arrived to break up the altercation, and Thomas argued with him, and was eventually told to leave the area. According to Thomas, he, Cruz, and three other men then got into a taxi, and returned to Gill Park.

3

At approximately 12:30 a.m., Thomas said that he paid a man named Pablo to drive him and Cruz back to his mother's house. However, Pablo only took them as far as 63rd Street and Yale, and refused to drive them further. After fighting with Pablo, Thomas and Cruz decided to take the bus. Once on the bus, however, Cruz yelled at Thomas and exited the bus. Thomas said that he followed her because she had his cellphone. They argued and, according to Cruz's testimony, Thomas tried to hit her, so she told him that she was calling the police. Thomas then ran away, and he said that he paid someone at a nearby gas station $7 to drive him the rest of the way to his mother's house. Cruz testified that meanwhile the police arrived and she made a police report approximately an hour later at 1:15 a.m. The police report was never admitted into evidence.

Thomas testified that he arrived home at 2:00 a.m. and his mother's boyfriend answered the door. He then proceeded to argue with his mother for approximately forty-five minutes, after which he called his sister, Melody Kinsey ("Kinsey"), and the mother of his child, Shonnette Ringgold ("Ringgold"), to see if he could stay with her. Thomas said that he stayed at his mother's house and fell asleep. Thomas's mother testified on direct examination that Thomas arrived home at 2:30 a.m., they argued, he made a few phone calls, and then he went to bed. His mother had also told investigators at one point that Thomas arrived home at exactly 2:37 a.m. On cross-examination however, his mother admitted that she originally told police that she went to bed around 10:30 p.m. and did not see Thomas until 5:00 a.m. the next morning. Kinsey testified that she received a call from Thomas at 3:00 a.m., but admitted on cross examination that she originally told the police that she received a call at exactly 2:37 a.m. Ringgold testified that she received a call from Thomas around 2:00 or 3:00 a.m., but that he never came over. Lastly, Thomas's uncle, Samuel Colbert ("Colbert"), who lived at the house, testified that on the

evening in question, he had been drinking with a friend and returned home early. Colbert said that he was watching a movie when Thomas returned home, although he did not know what time it was. He then watched as Thomas and his mother argued for "some hours." On cross-examination however, Colbert admitted that he originally told the police and an assistant state's attorney that he had been out with a woman that evening and did not return home until 7:00 a.m., and that Thomas did not return until 9:00 a.m. The prosecution called rebuttal witnesses who also testified as to what Thomas's family members originally told investigators. Ultimately, the jury found Thomas guilty of first degree murder.

## B. Procedural History

Thomas filed a direct appeal raising several claims for relief, including an argument that the trial court erred by failing to hold a fitness hearing before trial. The Illinois Appellate Court rejected Thomas's arguments and affirmed his judgment and conviction on June 17, 2004. Thomas's petition for leave to appeal ("PLA") to the Illinois Supreme Court was denied on November 24, 2004.

Thomas filed his first, state post-conviction petition on April 27, 2005. Thomas argued, *inter alia*, that he was actually innocent in light of newly discovered evidence showing that Robert Pinkston ("Pinkston") had committed the murder for which Thomas was convicted. The newly discovered evidence consisted of a letter from his attorney to the assistant state's attorney from January 12, 2005, which stated the following:

> I am writing you concerning the case of People v. Tony Thomas, Case # 01-CR-25695 which went to trial in front of Judge James Linn and a jury.
> I have recently received hearsay information from someone who works in the neighborhood of the homicide that the beat officer, John Massi, was informed by some of the various neighborhood gang members that Tony Thomas did not commit the homicide and that a drug dealer named Robert Pinkston did. Obviously, this information was not known to me at the time of the trial.

> Due to the evidence which has Tony Thomas battering his girlfriend on 63rd Street shortly before this homicide on Belmont Avenue, I would appreciate it if Pinkston could be looked into.

Second Am. Pet. for Writ of Habeas Corpus Person in State Custody, at p. 19. The trial court denied the post-conviction petition on May 4, 2005. The state appellate court affirmed on February 7, 2007, finding that the unauthenticated letter containing layers of hearsay was insufficient to show actual innocence, particularly in light of the overwhelming evidence presented against Thomas at trial. See State Court Record Ex. M, at p. 5. The Illinois Supreme Court denied a PLA on May 31, 2007.

On November 6, 2007, Thomas filed a motion for leave to file a successive post-conviction petition in the state court. Thomas argued that the state withheld exculpatory evidence, which showed that Pinkston committed the murder, in violation of Brady v. Maryland, 373 U.S. 83 (1963). The court denied his motion on December 11, 2007. The appellate court affirmed the denial of Thomas's motion for leave to file a successive petition on March 30, 2010. The appellate court found that Thomas failed to show the requisite cause necessary to allow the filing of a successive post-conviction petition under Illinois law because the record established that he was aware of his potential Brady claim, but nevertheless failed to properly present it in his initial post-conviction petition. Thomas filed a PLA which was denied by the Illinois Supreme Court on November 24, 2010.

Several years earlier, on November 14, 2007, Thomas sent this Court his first § 2254 petition, which was eventually filed on January 25, 2008. On February 4, 2008, the Court granted Thomas's motion to stay his § 2254 proceedings while he exhausted the remainder of his state court remedies.

In the interim, on August 28, 2008, Thomas filed a lawsuit in state court seeking declaratory relief regarding a request for documents that he had made to the Chicago Police Department pursuant to the Freedom of Information Act ("FOIA"). The trial court dismissed Thomas's suit on September 11, 2008. Thomas appealed, but because he had filed in the wrong venue, his motion to voluntarily dismiss was granted on May 6, 2010. Meanwhile, Thomas pursued his FOIA motion in the proper state court venue.

On June 7, 2011, Thomas filed a renewed motion to stay the instant proceedings or to file an amended § 2254 petition. On June 15, 2011, the Court granted Thomas's motion to continue the stay while he pursued his state court remedies, but denied his motion to file an amended petition. Thomas then filed another motion to continue the stay, brought by way of a status report, which the Court denied, thereby lifting the stay of the instant proceedings on October 24, 2011. Although the Court once again denied Thomas leave to file an amended petition, he nevertheless filed an amended petition on November 17, 2011, which the respondent answered. However, on February 27, 2012, the Court granted Thomas's motion to reconsider staying the proceedings because the state appellate court had granted him leave to file a late notice of appeal on November 29, 2011. Thomas was ordered to submit status reports regarding the stay every ninety days.

Ultimately, on June 20, 2013, the Court lifted the stay in the proceedings for the final time. After Thomas agreed to voluntarily dismiss several of his claims, the Court granted him leave to file an amended § 2254 petition on September 24, 2013. Now, in the year 2014, Thomas's petition for a writ of habeas corpus is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). "Federal habeas relief from a state-court criminal judgment is not easy to come by because the Antiterrorism and Effective Death Penalty Act of 1996 (the 'AEDPA') requires [federal courts] to defer to a great extent to the decisions of the state courts." Kamlager v. Pollard, 715 F.3d 1010, 1015 (7th Cir. 2013) (internal quotation marks and citation omitted). Section 2254(d) sets a high hurdle for habeas relief. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). Pursuant to the AEDPA, "a writ of habeas corpus shall not be granted unless the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence' before the state court." McElvaney v. Pollard, 735 F.3d 528, 532 (7th Cir. 2013) (quoting 28 U.S.C. § 2254(d)). For purposes of habeas relief, the Court reviews "'the last reasoned opinion on the claim'" from the state court. Woolley v. Rednour, 702 F.3d 411, 421 (7th Cir. 2012) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"Generally, a petitioner must raise a claim in state court before raising it on federal habeas review. This exhaustion requirement includes raising both the broad claim . . . but also the specific arguments and 'operative facts' within that claim." McNary v. Lemke, 708 F.3d 905, 919 (7th Cir. 2013) (internal quotation marks and citations omitted). "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each

8

level of state court review has procedurally defaulted that claim." Lewis v. Sternes, 390 F.3d 1019, 1026 (7th Cir. 2004). "Procedural default generally precludes a federal court from reaching the merits of a *habeas* claim when the claim was not presented to the state courts and it is clear that the state courts would now find the claim procedurally barred." Bolton v. Akpore, 730 F.3d 685, 696 (7th Cir. 2013). A claim is also considered procedurally defaulted if the state court denied a claim based "on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991).

In either case, however, "[p]rocedural default may be excused . . . if the petitioner can show both cause for and prejudice from the default, or can demonstrate that the district court's failure to consider the claim would result in a fundamental miscarriage of justice." Bolton, 730 F.3d at 696. "A prisoner may demonstrate cause for a procedural default by showing 'that some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule.'" Crank v. Duckworth, 969 F.2d 363, 365 (7th Cir. 1992) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1985)). "Prejudice means, an error which so infected the entire trial that the resulting conviction violates due process." Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010) (internal quotation marks and citation omitted). Lastly, in order to demonstrate a fundamental miscarriage of justice, a habeas petitioner must show "that a constitutional violation has probably resulted in the conviction of one who is actually innocent" such that "no reasonable juror would have convicted [the petitioner] in the light of the new evidence." Id. at 387 (internal quotation marks and citation omitted).

B. Thomas's Claims

In the instant motion, Thomas raises three grounds for relief: (1) that the trial court violated his right to due process by failing to hold a fitness hearing because there was a bona fide

doubt as to his fitness to stand trial; (2) that the prosecution committed a Brady violation when it failed to disclose that a Chicago police officer had been informed by local gang members that Pinkston was the actual shooter; and (3) that he is actually innocent based on five different pieces of evidence.

### *1. Failure to Conduct a Fitness Hearing*

First, Thomas argues that because there was a bona fide doubt as to his fitness to stand trial, the trial court violated his Fourteenth Amendment right to due process when it failed to conduct a fitness hearing. "Where there is substantial reason to doubt the defendant's fitness, due process obligates the trial judge *sua sponte* to order a competency hearing." Sturgeon v. Chandler, 552 F.3d 604, 612 (7th Cir. 2009) (internal quotation marks and citations omitted). Thomas raised this issue on direct appeal, and it was rejected by the Illinois appellate court. As discussed above, the decision of the Illinois appellate court on this issue will not be disturbed unless its decision "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence' before the state court." McElvaney, 735 F.3d at 532 (quoting 28 U.S.C. § 2254(d)). "A state court decision is contrary to clearly established federal law if the court applies a rule that plainly contradicts the Supreme Court's governing rule or if it comes to a result different than did the Supreme Court on substantially identical facts." Avila v. Richardson, No. 13-1833, 2014 U.S. App. LEXIS 8615, at *6 (7th Cir. May 7, 2014) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

At a court appearance prior to trial, Thomas's attorney requested a clinical behavioral examination of Thomas to determine his fitness to stand trial, as well as to determine his sanity at

the time of the offense. Counsel informed the court that Thomas was on medication during one of his visits to the jail, that he had been receiving psychiatric treatment while in custody, and that he had received psychiatric treatment in the past but was no longer taking medication. Counsel further told the court that Thomas was unable to cooperate with him and that he was unsure how much Thomas understood. The court then granted Thomas's request for a fitness examination.

The court received the report from Thomas's fitness exam on May 20, 2002. The report found that Thomas was fit to stand trial, he understood the charges against him, he was able to comprehend the nature of the courtroom proceedings, he correctly defined the roles of various courtroom personnel, he displayed the capacity to assist his attorney in his defense, and he was sane at the time of the incident and not under the influence of psychotropic medication. After reviewing the report the following discussion took place:

> THE COURT: * * * We have an indication by the Psychiatric Institute that after examination, according to Doctor Guzman [sic] he is both fit for trial and was sane at the time of the offense. What request is being made?
>
> [State's Attorney]: * * * We were waiting for any discovery. The only thing I am waiting for is an answer from the defense.
>
> * * *
>
> [Defense Counsel]: Mr. Thomas indicates to me as he was brought up [sic] on the last court date, he wishes to go pro se. Obviously you have to admonish him and ask him if this is truly his desire.

State Court Record Ex. A, at p. 18. The court then discussed Thomas's request to proceed pro se, and took a short recess. When the case was recalled, Thomas's attorney asked for a jury trial.

On appeal, Thomas argued that the trial court expressed a bona fide doubt as to his fitness to stand trial by granting his request for a fitness examination, and thus, the court erred by failing to hold a fitness hearing. The appellate court applied the Illinois standard with respect to fitness to stand trial.

11

> In Illinois, a defendant is presumed fit to stand trial and is considered unfit only if his mental or physical condition prevents him from understanding the nature and purpose of the proceedings against him or assisting in his own defense. When a *bona fide* doubt as to defendant's fitness to stand trial exists, the court must order a fitness hearing to resolve the question of fitness before the case proceeds any further.

People v. Hill, 803 N.E.2d 138, 143 (Ill. App. Ct. 2003) (internal citations omitted). The Illinois standard for fitness comports with the constitutional obligations of due process. See Dusky v. United States, 362 U.S. 402, 402 (1960) ("[T]he test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (internal quotation marks and citation omitted)); see also Sturgeon v. Chandler, 552 F.3d 604, 610 (7th Cir. 2009). Thus, the appellate court did not unreasonably apply federal law with respect to the fitness standard. Nor did the decision of the appellate court involve an unreasonable determination of the facts before it. As discussed above, the appellate court's factual determination is presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The court found that, "[a]lthough the [trial] court did not expressly state that it found defendant fit, by proceeding with trial, the court implicitly found no *bona fide* doubt as to defendant's fitness." State Court Record Ex. A, at p. 19. This finding is wholly supported by the evidence, and therefore, is presumed to be correct. The record shows that the trial court and the parties reviewed Thomas's fitness evaluation which concluded, *inter alia*, that Thomas was indeed sane at the time of the offense, fit to stand trial, capable of participating in his defense, and able to communicate with his attorney. The trial court then asked the parties if they had any requests with respect to the report. The prosecution deferred to counsel for Thomas, who abandoned the issue of fitness as resolved, and moved on to having a trial date set. In addition, the appellate court notes that the trial court had the benefit of

communicating with Thomas regarding his right to proceed pro se, and that in doing so, Thomas demonstrated a clear understanding of the proceedings which created no doubt as to his fitness to stand trial. Indeed, Thomas has amply demonstrated his fitness and comprehension of the legal proceedings against him through his many pro se filings before all levels of the state court and this Court. Because the decision of the Illinois appellate court was not contrary to federal law or based upon an unreasonable determination of the facts, Thomas's petition for habeas relief on this issue is denied.

### 2. *Brady* Violation

Next, Thomas argues that his constitutional rights were violated because the state violated Brady by failing to disclose that a Chicago police officer had been informed by local gang members that Pinkston committed the murder, not Thomas. The state argues that, among other things, this claim is procedurally barred because it was dismissed by the state court on an independent and adequate state-law ground. See Coleman, 501 U.S. at 729.

Thomas first raised his purported Brady claim in his motion to file a successive post-conviction petition in state court, which the trial court denied. On appeal, the court affirmed and found that Thomas was unable to establish cause for failure to bring the claim in his initial post-conviction petition as required by the Illinois statute governing post-conviction procedures. See 725 Ill. Comp. Stat. 5/122-1(f) ("Only one petition may be filed by a petitioner under this Article without leave of court. Leave of court may be granted only if a petitioner demonstrated cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure."). Because Thomas's Brady claim was dismissed based on an independent and adequate state law, his claim is likewise procedurally defaulted on federal habeas review.

Procedural default, however, can be excused "if the petitioner can show both cause for and prejudice from the default, or can demonstrate that the district court's failure to consider the claim would result in a fundamental miscarriage of justice." Bolton, 730 F.3d at 696. With respect to cause, Thomas may "demonstrate cause for a procedural default by showing that some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule." Crank, 969 F.2d at 365 (internal quotation marks and citation omitted). Thomas claims that he did not have sufficient evidentiary support to include his Brady claim in his first post-conviction petition before the state court because he did not know from whom his attorney received the information about Pinkston. When he filed his motion for a successive petition, Thomas argued that he now had an affidavit to support his claim, which was previously unavailable. The affiant, attorney Gayle Thorn, said that "in the course of her investigation, she spoke with [Thomas's] trial counsel who told her that a man named George or Jorge who worked in the neighborhood told him that Officer Massi was informed by some gang members that Pinkston committed the murder." State Court Record Ex. U, at p. 12. As the appellate court found, this affidavit contains nothing more than another layer of hearsay on top of his trial attorney's original letter to the assistant state's attorney, which he attached to his first post-conviction petition. More importantly, Thomas fails to explain how he was impeded from producing an affidavit from Officer Massi or from the person who told Officer Massi that Thomas did not commit the murder—assuming that person had personal knowledge of the events. Accordingly, Thomas fails to establish cause to overcome the procedural default of his Brady claim.

### 3. *Actual Innocence*

Finally, Thomas argues that he is actually innocent. To establish the requisite probability of innocence, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Smith, 598 F.3d at 387-388 (internal quotation marks and citation omitted). It is unclear whether Thomas intends this as an argument to establish a fundamental miscarriage of justice to overcome the procedural default of his Brady claim, or whether he argues it merely as a free-standing claim. See McQuiggin v. Perkins, 133 S. Ct. 1924, 1931 (2013) (regarding a fundamental miscarriage of justice, "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief"). In either case, Thomas alleges that there are five items of evidence which support his innocence: (1) the January 12, 2005 letter from his attorney to the assistant state's attorney describing the hearsay information that he received after Thomas's trial which implicated Pinkston in the murder; (2) a 2007 affidavit from Margaret Betts, wherein she describes a telephone conversation that she overheard between Thomas and Detective Tony Villardita (whom she refers to as "Detective Tony "Villdita") where Villardita allegedly told Thomas that Officer Massi was told by several people that Thomas did not commit the murder; (3) a Chicago Police Department ("CPD") report describing Cruz's complaint that Thomas slapped her after arguing over money, which lists the date and time of the occurrence as approximately 1:15 a.m. on September 23, 2001; (4) a CPD Progress Report dated September 24, 2001, which states that Cota, a witness and friend of the victim, had described a picture of Pinkston as resembling the shooter as an "8" on a scale of 1 to 10, but that the shooter was a little older; and (5) a CPD Supplementary Report which states that,

15

at one point, witnesses Perez and Hoyos said that the shooter had a dark complexion and a short afro-style haircut.

As an initial matter, the Court notes that these evidentiary items are not newly discovered as the majority were available to Thomas at the time of trial, and all were available during the post-conviction proceedings in state court. In any event, as the state court found, the letter from Thomas's trial counsel to the assistant state's attorney is unsubstantiated and contains nothing but hearsay. The affidavit of Margaret Betts fairs no better, as it is also based on layers of uncorroborated hearsay. Thus, the first two evidentiary items, containing vague and unsupported allegations are insufficient to establish actual innocence.

With respect to the police report memorializing Cruz's complaint that Thomas hit her, Thomas argues that it proves his alibi defense that he was not on the north side of the city during the shooting. The Cruz police report, however, lists the time of the battery as 1:15 a.m., and the shooting was called into police at 2:25 a.m. At most, the report shows only where Thomas may have been over an hour before the shooting. Furthermore, during trial, the jury heard Cruz's testimony regarding the timing of this incident and heard other testimony in support of Thomas's alibi defense—which the jury rejected. Accordingly, this evidence does not rise to the level of that required to establish a claim of actual innocence.

As to the two remaining reports regarding witnesses Cota, Hoyos, and Perez's descriptions of the shooter, this asserted evidence likewise fails to establish Thomas's innocence. Cota did not identify Pinkston as the shooter; he merely said that he resembled the shooter, but that the shooter was a little older. And while Hoyos and Perez may have incorrectly described Thomas's complexion and haircut in one report, they—along with Cota and two other witnesses—positively identified Thomas as the shooter in a photo array, a live line-up, and in

16

court. Moreover, these witnesses testified at Thomas's trial and were subject to cross-examination. In sum, Thomas's evidentiary items, whether viewed singularly or as a whole, fail to establish his claim of actual innocence. Thus, this argument is insufficient to overcome the procedural default of Thomas's <u>Brady</u> claim, and fails as a free-standing claim to the extent that such a claim is cognizable.

### III. CONCLUSION

For the foregoing reasons, Thomas's petition for habeas relief pursuant to § 2254 is denied. Because Thomas can neither "make a substantial showing of the denial of a constitutional right," nor show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling," <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000), the Court denies a Certificate of Appealability.

IT IS SO ORDERED.

ENTER:

*[signature: Charles R. Norgle]*

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: June 17, 2014